**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**NANCY A. MCCASLIN**
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**SERGIO A. LÓPEZ**
Indiana Department of Child Services
Elkhart, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
    Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF L.L. (Minor Child), | ) ) ) |
| | ) |
| and, | ) |
| | ) |
| R.L., (Father), | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | ) No. 20A03-1107-JT-337 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
Cause No. 20C01-1102-JT-11

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

R.L. ("Father") appeals the termination of his parental rights to his child, L.L. We affirm.

## Issue

The sole issue before us is whether there is sufficient evidence to support the termination of Father's parental rights.

## Facts

L.L. was born in February 2006 to Father and S.D. ("Mother"). Father and Mother were not married. In August 2006, Father was convicted of two counts of Class C felony nonsupport of a dependent on charges related to two children other than L.L. He was sentenced to a term of ten years, with five years to be spent in community corrections and five years suspended. Father also has previous convictions for criminal recklessness, possession of methamphetamine, and battery.

In July 2007, Father was found to have violated the terms of his community corrections placement and was ordered to serve five years in the Department of Correction. While incarcerated at the Westville Correctional Facility, Father obtained his

GED. Because of obtaining his GED, Father was released early from Westville in December 2008 and was placed on probation.

During this period of time L.L. was living with Mother and L.L.'s Stepfather. In March 2009, the Elkhart County Office of the Department of Child Services ("DCS") received a report alleging that Mother and Stepfather were manufacturing methamphetamine in the home. Mother, Stepfather, and L.L. all subsequently tested positive for methamphetamine. DCS removed L.L. from the home and placed her in foster care. The trial court found her to be a CHINS based upon Mother's and Stepfather's admissions.

At the dispositional hearing on the CHINS petition on May 6, 2009, Father was present and the trial court asked whether placement of L.L. with Father was possible. The DCS case manager responded that Father was "a potential placement" but indicated that she had had trouble contacting Father. Tr. p. 54. The trial court then stressed to Father the importance of cooperating with DCS. In the CHINS dispositional order entered on May 6, 2009, the trial court ordered Father to undergo a parenting assessment and continued L.L.'s placement in foster care. The trial court did not order Father to undergo any services at this time.

In August 2009, Father was found to have violated his probation for failing to make payments on his child support arrearage, which had accrued to approximately $20,000. Father was then placed on work release. While on work release, he tested

3

positive for opiates in August 2009[1] and for alcohol in December 2009, but his work release was not revoked on either occasion.

On August 7, 2009, DCS filed a motion for rule to show cause why Father should not be held in contempt because he had failed to undergo the parenting assessment as ordered. On August 27, 2009, the trial court found Father to be in contempt but suspended a 180-day jail sentence, contingent upon Father complying with all future orders.

On September 11, 2009, Father met with a psychologist, Dr. Kent Hershberger, to undergo the required parenting assessment. Among other things, Father told Dr. Hershberger that he had been sober for three years, and Father did not mention that he had recently had his probation revoked and had been placed on work release. Dr. Hershberger opined that Father was "reasonably qualified" to care for L.L. Ex. G. He also had no concerns that Father was at risk of abusing L.L. Dr. Hershberger also stated, "The prognosis for this case is fair to good" and that reunification with L.L. was recommended if Father participated in various programs, including a 12-step substance abuse group, a vocational assistance program, parenting classes, transitioning from supervised to unsupervised visitation, and the use of an in-home aide when and if reunification occurred. Id. Given his placement in work release at about the same time as the assessment was performed, Father never completed any of these programs. Dr.

---

[1] Father claims this test result occurred because he was taking Vicodin for a dental problem, although he apparently did not have a prescription for this drug.

4

Hershberger also stated that he would be concerned if it came to light that Father was reoffending.

When meeting with a DCS caseworker after the assessment was completed, Father said he needed to concentrate on resolving his legal issues and completing work release before he could concentrate on L.L. and the recommended programs. Father did manage to maintain regular supervised visitation with L.L. even after being placed on work release. Those visits went smoothly and raised no concerns with DCS.

In July 2010, after Mother and Stepfather had undergone substance abuse treatment, L.L. was placed back in Mother's home. However, Mother again tested positive for methamphetamine use and, in January 2011, L.L. was removed from Mother's home and placed back in foster care.

In December 2010, Father again tested positive for alcohol use while on work release, his work release privileges were revoked, and he was ordered to serve his previously suspended five-year sentence at the Elkhart County Corrections Center. At the time of the termination hearing in this case, Father was scheduled to be released in 2013.[2]

On February 23, 2011, the DCS filed a petition to terminate Father's and Mother's parental rights to L.L. The trial court conducted a hearing on the petition on July 8, 2011. The DCS and CASA presented evidence that L.L. was doing very well in

---

[2] Father testified that he was scheduled to be released in February 2012 or possibly earlier, if a request for early release was granted, but the evidence most favorable to the trial court's judgment, as reflected by the testimony of a DCS caseworker, was that he would not be released until 2013.

her current foster home placement. Father testified that after being released from prison in December 2008 and before he was sent to work release for violating his probation in July 2009, he frequently visited with L.L. and picked her up from Mother's home to take her places. He also testified that he had recently verified his previous employer would permit him to return to work when released from jail and his previous landlord had a place for him to live, as well as additional part-time work that he could perform. Further, he stated that because he had performed trustee work at the jail during his current term, he was applying to be released early. He also claimed to be participating in Narcotics Anonymous ("NA") and Alcoholics Anonymous ("AA") classes while in jail. Additionally, Father stated that while incarcerated at Westville, he had participated in parenting classes, an anger management program, and a substance abuse program, in addition to obtaining his GED. However, Father did not provide any documentation with respect to having completed these classes, or to having participated in any NA or AA classes.

On July 14, 2011, the trial court entered its order terminating Father's parental rights to L.L. with accompanying findings and conclusions.[3] The trial court found, among other things, that there was no evidence Father "recognized that there was a risk to the child in mother's home or, more important, that he made any attempts to remove the child from mother's care." App. p. 8. It also noted that Father failed to participate in any services in the CHINS case until DCS filed a contempt petition essentially forcing him to

---

[3] Mother's parental rights to L.L. also were terminated in this order. Mother does not appeal.

undergo the parenting assessment. Even after that assessment, the trial court found there was no evidence Father completed any of the programs or services that Dr. Hershberger believed were necessary to permit Father to care for L.L. Additionally, the trial court noted Father has been unable to avoid incarceration stemming from his 2006 criminal convictions, which were the latest in a series of several convictions. Father now appeals.

**Analysis**

"When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences most favorable to the judgment. Id. "We must also give 'due regard' to the trial court's unique opportunity to judge the credibility of the witnesses." Id. (quoting Indiana Trial Rule 52(A)). Where a trial court enters findings of fact and conclusions thereon, as the trial court did here, we apply a two-tiered standard of review. Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id. We will set aside the trial court's judgment only if it is clearly erroneous, which occurs if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. Id.

A petition to terminate a parent-child relationship must allege:

> (A) that one (1) of the following is true:
>
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

7

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS has the burden of proving these allegations by clear and convincing evidence. I.A., 934 N.E.2d at 1133.

Father argues there is insufficient evidence of a reasonable probability that the conditions leading to L.L.'s removal would not be remedied, and that continuation of the

8

parent-child relationship poses a threat to L.L's well-being. Referring to a prior version of Indiana Code Section 31-35-2-4(b)(2)(B), our supreme court observed that the statute was written in the disjunctive, requiring DCS to prove only one of the requirements of subsection (B). Id. Although the statute has been amended, it specifically requires allegations of only one of the three factors. See I.C. § 31-35-2-4(b)(2)(B)(i)-(iii). Thus, even though Father argues DCS failed to prove two of the factors, we only need to address whether DCS proved that the conditions resulting in L.L.'s removal will not be remedied. See Bester v. Lake County Office of Family and Children, 839 N.E.2d 143, 148 n.5 (Ind. 2005) (observing that under the prior version of the statute DCS was required to prove either of the two factors, not both).

In a situation such as this, where L.L. was not in Father's care at the time DCS originally placed her in foster care after removing her from Mother, a court must first determine what conditions led to DCS placing and then retaining a child in foster care rather than placing her with a noncustodial parent. See I.A., 934 N.E.2d at 1134. Second, a court must determine whether there is a reasonable probability that those conditions will not be remedied. Id. A court must address both requirements in order to support a finding that the conditions leading to a child's placement outside the home will not be remedied. See id. If the conditions that originally led to a child's placement outside a parent's home have been remedied, parental rights still may be terminated if there are reasons for a child's continued placement outside the parent's home that have

9

not been remedied. <u>In re Termination of Parent-Child Relationship of D.D.</u>, 804 N.E.2d 258, 266 n.3 (Ind. Ct. App. 2004), <u>trans. denied</u>.

Father argues that DCS's original involvement and L.L.'s placement in foster care was occasioned by Mother's misconduct and not his. In its findings, the trial court stated that Father "has never been a placement option." App p. 12. That does not seem entirely accurate. At the CHINS dispositional hearing, the DCS caseworker stated that Father was "a potential placement, but we—we talked today because I have been trying to contact him and couldn't, but we got some right phone numbers with some addresses today so [sic]." Tr. p. 54-55. The trial court also found that Father was on work release "when the case was initiated . . . ." App. at 13. If the trial court was referring to the CHINS case, this also was an erroneous finding.[4] Father was on probation in the first half of 2009 when the CHINS case began and L.L. was initially placed in foster care; the criminal case records before us clearly indicate that he was not placed on work release until August 2009. The trial court also found Father at fault for failing to unilaterally remove L.L. from Mother's care before the CHINS case began. However, there is no evidence Father was aware of the extent of Mother's drug problem at that time.[5]

Regardless of these faulty findings, we conclude there are adequate additional findings and evidence regarding the conditions that had led DCS to placing and then

---

[4] If the trial court was referring to the termination petition filing, Father was in jail, not work release, at that time.

[5] In September 2009, or nearly six months after L.L.'s initial removal from Mother's care, Father told Dr. Hershberger that he was aware of Mother's drug addiction.

10

retaining L.L. in foster care rather than ever placing her with Father. First, as part of the CHINS dispositional order, Father was ordered to undergo a psychological parenting assessment. Father did not undergo that assessment for several months and only did so after he had been found in contempt for failing to do so. It would have been reasonable for DCS not to consider placement of L.L. with Father until he underwent the assessment. And, by the time Father did undergo the assessment, he had violated his probation and had been placed on work release, making it impossible for L.L. to be placed in his custody. Father remained in either work release or jail for the remainder of the CHINS case, thus precluding L.L. from ever being placed in his custody and curtailing his ability to complete the programs Dr. Hershberger believed were necessary for Father to parent L.L.

Thus, there essentially were two factors that led to L.L. never being placed in Father's custody: his failure to cooperate with DCS and complete necessary programs, and his frequent legal troubles. There is evidence of a reasonable probability that such problems would continue. When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and

11

employment. McBride v. Monroe County Office of Family and Children, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services. Id. "Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." Id.

Here, although Father was given multiple opportunities to avoid incarceration of any kind following his 2006 convictions for failing to pay child support, he has repeatedly squandered those opportunities. He claimed to have participated in several self-improvement programs while incarcerated at Westville from 2007 to 2008, including a parenting program and a substance abuse program.[6] However, he submitted no documentary evidence that he completed them. Moreover, even if he did in fact complete them, that did not dissuade Father from continuing to abuse substances and violating the terms of his probation, and then the terms of his work release, after he was released from prison.

Additionally, although Dr. Hershberger's assessment of Father generally was positive, or at least much more positive than his assessment of Mother, he still conditioned that assessment upon Father's completion of several programs, such as AA or NA and more parenting programs, and Father's avoidance of further legal trouble.

---

[6] Father seems to imply in his brief that he completed these programs after the CHINS case began. However, his testimony at the termination hearing clearly establishes that he participated in them before that time while incarcerated at Westville.

Although Father testified to participating in some such programs during his most recent stint in jail, he again did not submit any documentary evidence to indicate that he completed any such programs. It also appears Father failed to mention to Dr. Hershberger that he had recently violated the terms of his probation and been placed on work release. Father also told Dr. Hershberger that he had been sober for three years, but it was substance abuse problems that ultimately led to revocation of Father's participation in work release. Father's repeated failure to adhere to the conditions of his probation and work release also correlates with his not insignificant criminal history, aside from his child support convictions. Given this evidence, the trial court's conclusion that there was a reasonable probability that the conditions leading to L.L.'s placement outside of Father's care and continuation of that placement would not be remedied is not clearly erroneous.

Father also contends there is insufficient evidence that termination of his parental rights is in L.L.'s best interests. However, both the CASA and DCS caseworker for L.L. testified as to their belief that it was in L.L.'s best interests for Father's parental rights to be terminated, given the ongoing uncertainty of his legal situation and his failure to cooperate with DCS or complete programs recommended by Dr. Hershberger and L.L.'s need for permanency and stability. This court frequently has held that testimony by a caseworker and CASA or GAL alone may be sufficient to support a finding that termination of parental rights is in a parent's best interests. See, e.g., In re T.F., 743 N.E.2d 766, 776 (Ind. Ct. App. 2001), trans. denied.

13

We acknowledge that our supreme court in recent years has carefully reviewed cases in which incarcerated parents' parental rights have been terminated and the parent is due to be released in the near future, and has not necessarily relied solely upon the testimony of DCS caseworkers or other interested parties regarding a child's best interests. One such case is In re G.Y., 904 N.E.2d 1257, 1262 (Ind. 2009). There, a mother was incarcerated for an offense she committed twenty months before child was born, and there was no evidence that the mother had engaged in any other criminal activity or was anything other than a fit parent for those twenty months. After the mother was incarcerated, and she was unable to find someone to care for the child, a CHINS proceeding was initiated and the child was placed in foster care. While incarcerated, the mother completed an eight-week substance abuse program and a fifteen-week parenting program, had engaged in educational pursuits, and had secured both full-time employment and housing for after she was released from prison. Her scheduled release date from incarceration at the time of the termination hearing was two years and three months after the hearing; by the time of oral argument before our supreme court, that date had been moved back another year. The trial court terminated mother's parental rights, and this court affirmed.

On transfer, our supreme court reversed the termination, holding that there was insufficient evidence that termination of mother's parental rights was in the child's best interests. Id. at 1265-66. It noted that although mother had a criminal history, all of her crimes had been committed before the child's birth. It also observed that although

14

mother could not participate in every treatment service that was requested by the DCS because of her incarceration, she still had "made a good-faith effort" to participate in whatever programs were available to her in prison. Id. at 1262-63. The court also noted that mother would be released from incarceration in a relatively short period of time, that she had made definitive employment and housing arrangements following her release, and that because the child's foster care placement was "highly positive," it would be appropriate to permit the child to remain in foster care, rather than allowing his immediate adoption, while mother completed her incarceration and participated in the necessary DCS programs she could not complete while incarcerated. Id. at 1265-66.

The facts here are different than those in G.Y. Although Father's 2006 convictions for failing to child support apparently were based on a failure to pay support that largely if not entirely occurred before L.L. was born, Father, as noted, was given repeated chances to avoid any kind of incarceration for those convictions and did not take advantage of those chances. He violated the terms of probation of work release or probation for those convictions on three occasions, and was alleged to have done so on at least two other occasions. He also was held in contempt for failing to comply with the original CHINS decree and not cooperating with DCS's wishes in failing to timely undergo a parenting assessment at the very outset of the case. Also, although Father stated that he had employment and housing waiting for him after his release from jail, Dr. Hershberger had recommended that Father complete vocational training because in the past, Father had had jobs that were subject to frequent layoffs, which had led to his

15

inability to pay child support. This constitutes considerable evidence regarding L.L.'s best interests, in addition to the testimony of the DCS caseworker and CASA. In sum, although Father's parental situation was not as egregious as some cases and there is no evidence that he ever overtly abused L.L. or subjected her to harm, there still is sufficient evidence that he has failed to be the parent that a young child requires and that termination of his parental rights is in L.L.'s best interests.

Finally, Father contends DCS failed to prove that it had an adequate plan for L.L. following termination of his parental rights. DCS's plan for L.L. is adoption, though no specific family was mentioned as a possible placement. Nevertheless, putting a child up for adoption following termination of parental rights is an adequate plan for the child's future within the meaning of the termination statute, even if there is not a specific family in place to adopt the child. Lang v. Starke Co. Office of Family & Children, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), trans. denied. There is sufficient evidence that DCS has an adequate plan for L.L. following termination of Father's parental rights.[7]

## Conclusion

The DCS provided sufficient evidence to support the termination of Father's parental rights to L.L. We affirm.

Affirmed.

KIRSCH, J., and BRADFORD, J., concur.

---

[7] Father does not challenge that the termination petition was filed after the time frame required by the termination statute.

16